O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROY GALVAN,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>CITY OF LOS ANGELES; MIGUEL<br>TERRAZAS; DAVID NUNN; and DOES 1<br>through 10, inclusive,<br><br>　　　　Defendants. | CASE NO. CV 14-00495 CAS (AJWx)<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT |

On March 3, 2011, Roy Galvan was charged with the shooting murder of Joey Gutierrez.[1] However, he was acquitted of all charges following a 2012 jury trial.[2] On January 22, 2014, Roy Galvan sued the City of Los Angeles, David Nunn, Miguel Terrazas, Richard Arciniega, and various fictitious defendants, alleging civil rights violations pursuant to 42 U.S.C. § 1983. Specifically, Galvan alleges claims of false arrest and malicious prosecution; failure to intervene; and *Monell* liability.[3] He contends that there was no probable cause for arrest, and that defendants fabricated and failed to disclose key pieces of evidence that led to his arrest and continued prosecution.

---

[1]SUF, ¶ 81; SGI, ¶ 81.

[2]SUF, ¶ 249; SGI, ¶ 249.

[3]Complaint, Docket No. 1 (Jan. 22, 2014).

1    On July 14, 2015 the parties stipulated to dismiss Arciniega; the court approved the parties'

2    stipulation.[4]  On November 23, 2015 the remaining defendants moved for summary judgment on all

3    claims.[5]  Galvan opposes the motion.[6]

4                                          **I.  BACKGROUND**

5    **A.    Parties' Requests for Judicial Notice**

6          Defendants ask that the court take judicial notice of four documents related to the underlying

7    criminal action, *People v. Galvan,* L.A. Superior Court No. BA381625-0: the (1) certified docket,

8    (2) certified felony complaint, (3) transcript from the preliminary hearing, and (4) transcript from

9    the *Trombetta* motion.[7]  Galvan asks that the court take judicial notice of two documents: (1) the

10   Board of Rights Details, Civil Lawsuits, printout regarding the civil case *Gipson v. Los Angeles*

11   *Police Department*, Case Number 00-cv-0712; and (2) the docket report from that case.

12         "The court can judicially notice a fact that is not subject to reasonable dispute because it is:

13   (1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

14   readily determined from sources whose accuracy cannot reasonably be questioned."  FED.R.EVID.

15   201(b).  Court orders, pleadings, and other documents in related cases are appropriate subjects of

16   judicial notice under Rule 201 because they are capable of accurate and ready determination by

17   resort to the court's docket, whose accuracy cannot reasonably be questioned.  See *Reyn's Pasta*

18   *Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice of

19   pleadings, memoranda, and other court filings); *United States ex rel. Robinson Rancheria Citizens*

20   *Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court may take judicial notice "of

21

22         [4] Joint Stipulation to Dismiss Defendant Richard Arciniega, Docket No. 25 (July 14, 2015);

23   Order Dismissing Detective Richard Arciniega Only, Docket No. 26 (July 14, 2015).

24         [5]Memorandum of Points and Authorities in Support of Notice of Motion and Motion for

25   Summary Judgment ("Motion"), Docket No. 41 (Nov. 23, 2015).  *See also* Reply in Support of Notice
     of Motion and Motion for Summary Judgment ("Reply"), Docket No. 57 (Dec. 23, 2015).

26         [6]Opposition Re: Notice of Motion and Motion for Summary Judgment ("Opposition"), Docket

27   No. 54 (Dec. 7, 2015).

28         [7]Defendants' Request for Judicial Notice ("Defendants' RJN"), Docket No. 45 (Nov. 23, 2015).

1   proceedings in other courts, both within and without the federal judicial system, if those proceedings

2   have a direct relation to matters at issue").

3         Accordingly, the court takes judicial notice of all four of defendants' requested documents,

4   as well as Galvan's requested docket report from Case Number 00-cv-0712; it will not take judicial

5   notice of the truth of the facts recited therein, however.  *Lee v. City of Los Angeles*, 250 F.3d 668,

6   690 (9th Cir. 2001) (a court may take judicial notice of another court's opinion, not for the truth of

7   the facts recited therein, but for the existence of the opinion); *Wallis v. Centennial Ins. Co., Inc.*, 927

8   F.Supp.2d 909, 913-14 (E.D. Cal. 2013) ("The court will take judicial notice of these exhibits with

9   the caveat that '[w]hile the authenticity and existence of a particular order, motion, pleading or

10   judicial proceeding, which is a matter of public record, is judicially noticeable, [the] veracity and

11   validity of its contents (the underlying arguments made by the parties, disputed facts, and

12   conclusions of applicable facts or law) are not,'" quoting *United States v. S. Cal. Edison Co.*, 300

13   F.Supp.2d 964, 974 (E.D. Cal. 2004)).  The court declines to take judicial notice of the "Board of

14   Rights" printout, as the court is not aware of, nor does the plaintiff cite, any legal basis for doing so.

15         **B.**    **Factual Background**[8]

16         This action stems from the investigation of the shooting murder of Joey Gutierrez, which

17   occurred on January 28, 2011, at the intersection of 43rd Street and Main Street in the City of Los

18   Angeles.[9] Gutierrez was a member of the Hang Out Boys ("HOBs") street gang.[10]

19   / / /

20   / / /

21   / / /

22   —————————————

23       [8]The facts set forth in this order are those facts the court deems material to understand the
background of the litigation.  Unless otherwise noted, the court references only facts that are

24   uncontroverted and as to which evidentiary objections have been overruled.

25       [9]Defendants' Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), Docket No.

26   43 (Nov. 23, 2015), ¶¶ 4-6; Plaintiff's Responses to Defendants' Statement of Uncontroverted Facts and
Conclusion of Law and Plaintiff's Separate Statement of Disputed Material Facts and Conclusions of

27   Law ("SGI"), Docket No. 54-12 (Dec. 7, 2015), ¶¶ 4-6.

28       [10]SUF, ¶ 5; SGI, ¶ 5.

Terrazas and Nunn were the officers assigned to the murder investigation.[11]  Terrazas knew Gutierrez was a member of the HOBs.[12]  Terrazas and Nunn were also aware of a rivalry between the HOBs and the 41st Street Gang and that the gangs claimed different sides of the intersection at Main St. and 43rd St.[13]  Terrazas interrogated more than thirty murder suspects, and Nunn interviewed approximately fifty murder suspects.[14]  The officers also attempted to obtain information from Gutirrez's family regarding the suspect's identity, but were not successful.[15]  Galvan was arrested on March 1, 2011 and was interrogated at the LAPD's Newton Division.[16]  Terrazas and Nunn did not know Galvan prior to this investigation and did not know the witnesses whom they interviewed.[17]  Criminal charges for Gutierrez's murder were filed against Galvan on March 3, 2011.[18]  He was acquitted following a 2012 jury trial.[19]

### 1.      Witness Ernesto Jurado Interview

Shortly after being assigned to the Gutierrez murder investigation, on February 8, 2011, Terrazas interviewed eyewitness Jurado.[20]  Jurado indicated that he could not make an identification of the suspect.[21]  He did indicate that a Hispanic male fled the scene of the shooting in an eastbound direction,

---

[11]SUF, ¶ 9; SGI, ¶ 9.

[12]SUF, ¶ 18; SGI, ¶ 18.

[13]SUF, ¶ 19; SGI, ¶ 19.

[14]SUF, ¶ 20; SGI, ¶ 20.

[15]SUF, ¶ 25; SGI, ¶ 25.

[16]SUF, ¶ 71; SGI, ¶ 71.

[17]SUF, ¶ 53; SGI, ¶ 53.

[18]SUF, ¶ 81; SGI, ¶ 81.

[19]SUF, ¶ 249; SGI, ¶ 249.

[20]SUF, ¶ 28; SGI, ¶ 28.

[21]SUF, ¶ 29; Declaration of Miguel Terrazas in Support of Motion for Summary Judgment ("Terrazas Decl."), Docket No. 42 (Nov. 23, 2015), ¶ 18.  Plaintiff's objection that Jurado provided additional information regarding the physical appearance of the suspect does not contradict defendants'

1  and that the male was approximately seventeen years of age, 5'5", and 160 lbs.[22]  Jurado described the

2  suspect as wearing a multi-color Peruvian hat and holding a revolver.[23]  Galvan's arrest report provides

3  he was 5'5", 150 pounds, twenty-one years of age, and Latino.[24]  Jurado also indicated at least thirteen

4  times over the course of the interview that the shooter "ran" after firing the gunshots.[25]

5         Galvan had suffered an injury to his right ankle, on December 20, 2010, prior to Gutierrez's

6  murder.  His Achilles tendon was severed and detached, and he sustained an open fracture to his heel

7  bone requiring extensive surgical intervention to repair.  Galvan was unable to bear weight on that heel

8  for more than five months.  When defendants arrested Galvan  in March 2011, he could only ambulate

9  with crutches and only hop without them.[26]

10         The Chronological Record contains the following entry:

11         "On February 14, 2011, Witness Jurado phoned Terrazas and stated that he had forgotten

12         to mention that when suspect-1 had run from the location after the shooting [sic] had a

13         very noticeable limp when he ran eastbound.  Jurado said it appeared the suspect had

14         possibly been shot in the leg during the altercation."[27]

15         The entry is listed as an edit to the February 8, 2011 chronological entry regarding Jurado's

16  initial interview, not as a separate entry in the chronological record; as such, it is not apparent from the

17  record when the entry was made.[28]  Galvan argues this entry was fabricated, and offers Jurado's

18  subscriber records, which do not indicate that any phone calls were made to or from Terrazas on

19  _____

20  assertion that Jurado did not know the identity of the suspect.  See SGI, ¶ 29.

21      [22]SUF, ¶ 31; SGI, ¶ 31.

22      [23]SUF, ¶¶ 32, 33; SGI, ¶¶ 32, 33.

23      [24]SUF, ¶ 70; SGI, ¶ 70.

24      [25]SGI, ¶ 250; Plaintiff's Exh. 22 (Feb. 8, 2011 Transcript of Jurado Interview), Docket No. 54-22

25  (Dec. 7, 2015), at 7, 12, 14, 17, 18, 23, 35, 36, 38.

26      [26]SGI, ¶ 264; Plaintiff's Exhibits 30-32.

27      [27]Plaintiff's Exh. 10 (Chronological Record), Docket No. 54-5 (Dec. 7, 2015), at 2.

28      [28]*Id.*

February 14th.[29]   Defendants contest plaintiff's assertion that the entry was fabricated, conceding that no phone call took place on February 14th, but insisting that the record accurately describes a phone call that took place on February 13th, 2011.[30]   The parties do not dispute that a phone call took place on February 13th and that no phone call took place on February 14th; however, whether the chronological record reflects the contents of that phone call remains in dispute.

### 2.   Witness Joel Cifuentes Interview

On February 9, 2011, Terrazas interviewed Cifuentes.[31]   Cifuentes was not present at the time of the murder, and instead related information he had heard from Robert Flores.[32]   The Statement Form documenting the Cifuentes interview states that Flores told Cifuentes that one of the suspects who fired a gun at Gutierrez was a gang member named "Insane" and had been shot in the foot.[33]

Galvan contends that the portion of the Statement Form that refers to "Insane" was fabricated.[34] The name "Insane" does not appear in the interview transcript, nor does it appear in Terrazas's

---

[29]SGI, ¶ 253; Plaintiff's Exh. 20 (Jurado Phone Records), Docket No. 54-7 (Dec. 7, 2015), at 7. Plaintiff also offers Jurado's trial testimony, as recorded in the trial transcript for the underlying criminal trial, Plaintiff's Exhibit 5 (Trial Transcript), Docket No. 54-3 (Dec. 7, 2015), in which Jurado denies that he made any such phone call.  Defendant objects to Plaintiff's Exhibit 5 as lacking foundation, because it is missing the certification page.  (Defendants' Evidentiary Objections to Plaintiff's Evidence in Support of His Opposition to Defendants' Motion for Summary Judgment or Partial Summary Judgment ("Defendants' Objections"), Docket No. 59 (Dec. 23, 2015)).  The court notes that the trial transcript from Case No. BA381625-01 is properly subject to judicial notice and therefore available to the court. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (citation omitted)). However, Jurado's trial testimony is not necessary to bring the existence and contents of the February 14th phone call into dispute.  The court therefore need not address defendants' evidentiary objection at this stage.

[30]Defendants' Exh. 13 (Terrazas Phone Record).

[31]SUF, ¶ 45; SGI, ¶ 45.

[32]SUF, ¶ 46; SGI, ¶ 46.

[33]SUF, ¶ 47; Defendants' Exh. 18.

[34]SGI, ¶ 254.

1    handwritten notes taken at the interview.[35]  Terrazas contends that the reference to "Insane" was made

2    during an unrecorded portion of the interview.  However, in another portion of the interview transcript,

3    Cifuentes names "Creep" as the shooting suspect.[36]  When Galvan's criminal defense counsel followed

4    up with Cifuentes, he told her that although he knew of a gang member called "Insane," that man was

5    not Galvan, but rather an older male who was incarcerated at the time.[37]  Whether or not this portion of

6    the Cifuentes Statement Form was fabricated remains a disputed fact.

7          The recorded statement of the Cifuentes interview, as well as the Statement Form, was turned

8    over to the District Attorney's Office.[38]

9                          **3.    Mark Loving Interview**

10         Mark Loving was interviewed on February 28, 2011.[39]  At the time of the interview, Loving lived

11   with his girlfriend, Syrella Carpenter, in the alley behind the city yard, three doors down from Galvan,

12   and east of the intersection of the crime scene.[40]  Loving was first approached by Nunn, Terrazas and

13   two other detectives in the alley about a week after Gutierrez was killed; he did not provide the officers

14   with any information at that time.  Over the course of the next few weeks he was handcuffed and thrown

15   against the fence, taken to the station for questioning three times, and again handcuffed and thrown

16   ///

17   ///

18   ────────────────

19   [35]Plaintiff's Exh. 17 (Cifuentes Transcript), Docket No. 54-4 (Dec. 7, 2015); Defendants' Exh.
20   19 (Cifuentes Notes).  Defendants object to this evidence under Federal Rules of Evidence 402, 602,
     and 803, Relevance, Lack of Personal Knowledge, and Hearsay, respectively, because Cifuentes did not
21   witness the shooting, and his statements attributed to Flores are hearsay.  Defendants' objections are
     overruled. Exhibits 17 and 25 are not offered for the truth of the matter asserted; rather, plaintiff offers
22   these exhibits in an attempt to demonstrate that the witness statement form was fabricated, highlighting
     the differences between the two recordings of Cifuentes's testimony.
23

24   [36]Plaintiff's Exh. 17 at 5.

25   [37]SUF, ¶ 223; SGI, ¶ 223.

26   [38]SUF, ¶ 49; Terrazas Decl., ¶ 28.

27   [39]SUF, ¶ 54; SGI, ¶ 54; Terrazas Decl., ¶ 31.

28   [40] SUF, ¶¶ 56-57, 101, 103, 160; SGI, ¶¶ 56-57, 101, 103, 160.

1  against the fence.  The detectives also tore the top off of the tarp covering Loving and Carpenter's

2  makeshift home in the alley.[41]

3      Ultimately, Loving agreed to have his statement taken on February 28, 2011.  During the

4  recorded interview, Loving stated that Galvan admitted that Gutierrez had shot him in the foot on a prior

5  occasion and that he had shot and killed Gutierrez in retaliation.[42]  Loving selected plaintiff's photograph

6  from a six-pack of photographs.[43]  The recorded statement and reports relating to Loving's statement

7  were turned over to the prosecution.[44]

8      Defendants corroborated Loving's story regarding Gutierrez shooting Galvan in the foot by

9  identifying the related crime report, dated December 20, 2010.[45]  Neither party points to evidence

10  / / /

11  / / /

12

13  _____

14      [41]SUF, ¶¶ 184-87; SGI, ¶¶ 184-87.

15      [42]SUF, ¶¶ 58-59.

16      [43] SUF, ¶ 60; Terrazas Decl., ¶ 34; Nunn Decl., ¶ 15.  Galvan's objection that this statement is
    conclusory or irrelevant is overruled. P's objection does not bring this fact into dispute.

17

18      [44]SUF, ¶¶ 62-63.  Galvan's objection that this fact is irrelevant because defendants turned over
    the tape while concealing the methods used to procure the statement is overruled; this argument does
19  not contradict defendants' asserted fact.

20      [45]SUF, ¶ 64; Terrazas Decl., ¶ 33.  Galvan argues that this is a sham declaration, and that in
    actuality, defendants didn't review the report until the time of trial.  Galvan cites to Terrazas's
21  deposition, in which he stated that he did not investigate the incident involving the shooting of Galvan's
    foot at all.  (Plaintiff's Exh. 1 (Terrazas Deposition), Docket No. 54-2 (Dec. 7, 2015) at 252). Galvan
22  also cites to Nunn's deposition, in which he stated that he did not look for medical records regarding that
    incident, but that he did see a police report.  The deposition transcript does not clarify either way as to
23  whether Nunn saw the report before or after Galvan's arrest.  (Plaintiff's Exh. 6 (Nunn Depo), Docket
    No. 54-4 (Dec. 7, 2015) at 172).  Defendants object to both exhibits for lack of foundation under Federal
24  Rule of Evidence 901(b)(1) because the exhibits do not include the certification page and therefore are
    not authenticated.  Defendants' objection is sustained.  *See Orr v. Bank of America, NT & SA*, 285 F.3d
25  764, 777 (9th Cir. 2002) ("Exhibits H, J, P, W, and X purport to be transcripts of testimony from the
    Bourdeau trial. They do not identify the names of the witness, the trial, and the judge and are not
26  certified copies of the reporter's transcript.  Accordingly, they are not authenticated," citing *Steven v.
    Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir.1963) ("an uncertified copy of testimony
27  is inadmissible in a summary judgment proceeding")).

28

1   showing whether the defendants viewed the report before or after Galvan's arrest.  The report provides

2   that Galvan ran after he was shot on that date; it does not indicate the identity of Galvan's shooter.[46]

3   ### 4.    Syrella Carpenter Interview

4   Like her boyfriend, Loving, Carpenter initially refused to give a statement.  Over the course of

5   several weeks, officers handcuffed her, shoved her against a fence, and took her into the police station.

6   They placed her in a jail cell, and threatened to arrest her on an outstanding drug warrant.[47]  During that

7   time, Carpenter's General Relief benefits were also cut off; she believes this was because she "would

8   not complain against" Galvan.[48]

9   Carpenter ultimately agreed to have her statement taken, and on March 8, 2011, after Galvan was

10  arrested and charged with Gutierrez's murder Terrazas and Nunn interviewed Carpenter.[49]  She

11  identified Gutierrez as the murder victim from a six pack and plaintiff from a different six pack as the

12  person who admitted to killing Gutierrez.[50]  Carpenter identified Galvan as wearing a Peruvian hat; she

13  later testified that she would see other HOBs wearing the same hat.[51]  During the investigation, a

14  Peruvian style hat was recovered which fit the description provided by Jurado and Carpenter.[52]

15  At the time of Carpenter's interview, she did not appear to suffer from a mental illness of any

16  kind and also appeared to be sober.[53]

17

18  [46]SUF, ¶ 65; SGI, ¶ 65.

19  [47]SUF, ¶¶ 126-27, 135; SGI, ¶¶ 126-27, 135.

20  [48]SUF, ¶¶ 138, 140; SGI, ¶¶ 138, 140.

21  [49]SUF, ¶ 83; SGI, ¶ 83.

22
23  [50]SUF, ¶ 84; SGI, ¶ 84.

24  [51]SUF, ¶ 152; SGI, ¶ 152.

25  [52]SUF, ¶ 75; SGI, ¶ 75.

26  [53] SUF, ¶ 85; Terrazas Decl., ¶ 43; Nunn Decl., ¶ 19. Plaintiff objects, citing to Plaintiff's Exh.
    4 (Preliminary Hearing Transcript), Docket No. 54-3 (Dec. 7, 2015) at 150-51, 153, 154, and stating that

27  when Carpenter gave her statement to defendants, she was not taking her medication and had been using
    crack cocaine.  Defendant objects to Plaintiff's Exhibit 4 as lacking foundation under Federal Rule of

28  Evidence 901(b)(1) because the exhibit does not contain a certification page.  However, the fact that

**5.   June 2011 Preliminary Hearing**

Both Carpenter and Loving testified as to Galvan's confession at the preliminary hearing in June 2011.[54]  Carpenter testified that she was unaware that Galvan had been shot, but she was aware that he was wearing a cast on his foot and had been wearing the cast for a couple of weeks before Gutierrez was killed.[55]

At the end of the preliminary hearing, defense counsel made a formal request to have the case dismissed.[56]  The motion to dismiss was denied; the court stated there was sufficient cause to believe Galvan was guilty.[57]

After the preliminary hearing, a request to relocate Carpenter and Loving was made to the District Attorney Investigator's Office; the request was approved.[58]  All of the documents prepared in connection with the investigation were turned over to the District Atorney's Office, except for the log

/ / /

/ / /

---

Carpenter testified to these facts at the June 2011 preliminary hearing is not disputed. (SUF, ¶¶ 142-44; SGI, ¶¶ 142-44).  In any case, the fact that Carpenter was not taking her medication and was taking crack at the time of the interview does not directly bring into dispute defendants' assertion that she did not *appear* to suffer from a mental illness or drug use.

[54]SUF, ¶¶ 109-110, 154, 156; SGI, ¶¶ 154, 156. Plaintiff agrees that Carpenter testified to this but cautions the court that Carpenter's testimony was preceded by her contradictory testimony that 1) Galvan had not said anything to her after Gutierrez was killed; 2) Galvan had not said anything to her about killing Gutierrez; 3) Galvan never said he killed Gutierrez.  (Plaintiff's Exh. 4, at 128.) Defendants argue that Exhibit 4 is inadmissible for lack of foundation because the exhibit lacks the certification page of the reporter. (Defendants' Objections).  Because plaintiff's argument does not bring the stated facts into dispute, the court need not address defendants' objection at this time.

[55]SUF, ¶¶ 110, 113; SGI, ¶¶ 110, 113.

[56]SUF, ¶ 203; SGI, ¶ 203.

[57]SUF, ¶ 204; SGI, ¶ 204. Plaintiff's objection relates to the estoppel effect of the ruling, but does not bring this fact into dispute.

[58]SUF, ¶¶ 94, 96; SGI, ¶¶ 94, 96.

10

1   containing information about the re-location of Loving and Carpenter.[59]  This information was kept in

2   a locked cabinet at Newton Division.[60]

3                                    **II.  DISCUSSION**

4   **A.      Standard Governing Motions for Summary Judgment**

5           A motion for summary judgment must be granted when "the pleadings, the discovery and

6   disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

7   fact and that the movant is entitled to judgment as a matter of law."  FED.R.CIV.PROC. 56.  A party

8   seeking summary judgment bears the initial burden of informing the court of the basis for its motion

9   and of identifying those portions of the pleadings and discovery responses that demonstrate the

10  absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

11  Where the moving party will have the burden of proof on an issue at trial, the movant must

12  affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.

13  On an issue as to which the nonmoving party will have the burden of proof, however, the movant

14  can prevail merely by pointing out that there is an absence of evidence to support the nonmoving

15  party's case.  See *id.*  If the moving party meets its initial burden, the nonmoving party must set

16  forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine

17  issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC.

18  56(e)(2).  Evidence presented by the parties at the summary judgment stage must be admissible.

19  FED.R.CIV.PROC. 56(e)(1).  In reviewing the record, the court does not make credibility

20  determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

21  favorable to the nonmoving party.  *See T.W. Electric Service, Inc. v. Pacific Electric Contractors*

22  *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

23  **B.      Legal Standard Governing Qualified Immunity**

24          The doctrine of qualified immunity shields government officials from § 1983 liability for

25  "performing discretionary functions . . . [so long] as their conduct does not violate clearly established

26  ────────────────

27          [59]SUF, ¶ 90; Terrazas Decl., ¶¶ 39, 41; Nunn Decl., ¶¶ 21, 27.

28          [60]SUF, ¶ 92; Terrazas Decl., ¶ 48; Nunn Decl., ¶ 27.

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *see also Pierce v. Multnomah County*, 76 F.3d 1032, 1038 (9th Cir. 1996). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a framework for determining whether officials are entitled to qualified immunity. In evaluating a grant of qualified immunity, the court must ask two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the officers' conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011) (citing *Saucier,* 533 U.S. at 201-02).

In deciding whether a particular constitutional right was clearly established at the time of the incident, the court must define the right with reasonable particularity, i.e., "[t]he contours of the right must [have] be[en] sufficiently clear [at the time of the violation] that a reasonable official would understand that what he [did] violate[d] that right." *Anderson*, 483 U.S. at 640. "This is not to say," however, "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted). Indeed, the Supreme Court has explained that there are some "obvious case[s]" in which the need for a particularized definition of the constitutional right violated is unnecessary because the violation is so patent. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *see Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) ("[W]hen 'the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous preexisting case law is not required to

/ / /

1  show that the law is clearly established,'" quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.

2  1993)).

3      Where triable issues of fact remain that are critical in determining whether a defendant is entitled

4  to qualified immunity, the court must accept the plaintiff's version of the facts in assessing whether to

5  grant summary judgment on that basis. *See Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) ("Where

6  disputed facts exist, however, we can determine whether the denial of qualified immunity was

7  appropriate by assuming that the version of the material facts asserted by the non-moving party is

8  correct"); *Schwenk v. Hartford*, 204 F.3d 1187, 1195 (9th Cir. 2000) (stating that the court evaluates the

9  availability of qualified immunity at the summary judgment stage by "assum[ing] the version of the

10  material facts asserted by the non-moving party to be correct").

11      **C.    Whether Defendants are Entitled to Summary Judgment on Plaintiff's Unlawful**

12          **Arrest Claim**

13          **1.    Legal Standard Governing Fourth Amendment Unlawful Arrest Claims**

14      It is well established that "an arrest without probable cause violates the Fourth Amendment and

15  gives rise to a claim for damages under § 1983." *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076

16  (9th Cir. 2011).  An officer has probable cause to make a warrantless arrest when a reasonably prudent

17  person possessing the facts and circumstances within the officer's knowledge would conclude that the

18  suspect had committed or was committing a crime.  *Id.;Torres v. City of Los Angeles*, 548 F.3d 1197,

19  1206 (9th Cir. 2008) ("Probable cause to arrest exists when officers have knowledge or reasonably

20  trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has

21  been or is being committed by the person being arrested").  "Probable cause is an objective standard and

22  the officer's subjective intent in exercising his discretion to arrest is immaterial in judging whether his

23  actions were reasonable for Fourth Amendment purposes." *John v. City of El Monte*, 505 F.3d 907, 911

24  (9th Cir. 2007).

25      Probable cause does not require conclusive evidence of guilt, but only "some objective evidence

26  which would allow a reasonable officer to deduce that a particular individual has committed or is in the

27  process of committing a criminal offense." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).

28  "Neither certainty, nor proof beyond a reasonable doubt, is required for probable cause to arrest."

*United States v. Harvey*, 3 F.3d 1294, 1296 (9th Cir. 1993).  Rather, "courts look to the totality of the circumstances known to the officers in determining whether there is probable cause for an arrest." *United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105 (9th Cir. 2002).

The existence of probable cause is generally a question of fact to be resolved by the jury.  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)("Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury"); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000); *McKenzie*, 738 F.2d at 1008.  Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could conclude that the suspect's constitutional rights had been violated.  *Wallis*, 202 F.3d at 1138l; *see also McKenzie*, 738 F.2d at 1008.  The plaintiff bears the ultimate burden of proving that an arrest was effected without probable cause.  *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) (citing *Gilker v. Baker*, 576 F.2d 245, 246 (9th Cir. 1978)); *see also Larez v. Holcomb*, 16 F.3d 1513, 1517 (9th Cir. 1994).  While, "[o]nce [the fact of] a warrantless arrest is established, the burden of going forward with the evidence passes to the defendant[s]," plaintiff "retains the risk of nonpersuasion on the issue of illegal arrest." *Gilker*, 576 F.2d at 246.

## 2.   Whether Plaintiff is Estopped From Bringing an Unlawful Arrest Claim

Galvan was held to answer following a preliminary hearing in the underlying criminal case was held on June 2011 in the Los Angeles Superior Court.[61]  Defendants argue that because the Superior Court found that defendants had probable cause to arrest Galvan at the preliminary hearing, Galvan is now estopped from arguing that there was no such probable cause in his federal § 1983 action under the doctrine of collateral estoppel.

Because the preliminary hearing was a California state court proceeding, the court is required to apply California's collateral estoppel rules in deciding defendants' motion.  Under California law, "[a] prior determination by a tribunal will be given collateral estoppel effect when (1) the issue is identical to that decided in a former proceeding; (2) the issue was actually litigated and (3) necessarily decided; (4) the doctrine is asserted against a party to the former action or one who was in privity with such a

---

[61]SUF, ¶ 204; SGI, ¶ 204.

party; and (5) the former decision is final and was made on the merits."  *Kelly v. Vons Companies, Inc*. 67 Cal.App.4th 1329, 1339 (1998).  Federal and state courts have consistently held that collateral estoppel may preclude relitigation in a civil suit of issues that were decided in a prior criminal proceeding.  *Allen v. McCurry*, 449 U.S. 90, 104 (1980) (giving collateral estoppel effect to a ruling on a pretrial suppression motion); *Teitelbaum Furs, Inc. v. Dominion Insurance Co.*, 58 Cal.2d 601, 604-05 (1962) (giving collateral estoppel effect to a prior felony conviction).

In 1999, a California appellate court decided "whether a finding of probable cause to hold the accused over for trial on criminal charges forecloses a subsequent civil suit on the issue of probable cause to arrest," a question it described as "one of first impression in California."  *McCutchen v. City of Montclair*, 73 Cal.App.4th 1138, 1145 (1999).  In evaluating the issue, the court considered the Ninth Circuit's decision in *Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994), which addressed a similar question under Nevada law.  The *Haupt* court noted that a ruling at the conclusion of a preliminary hearing could constitute a final judgment on the merits because it was immediately appealable through a petition for writ of habeas corpus, and that sufficient identity of issues was present absent a showing that new evidence became available to the prosecution after plaintiff's arrest.  *Haupt*, 17 F.3d at 288-89.  The Ninth Circuit also noted "that for tactical reasons a litigant may well choose not to litigate probable cause fully during a criminal prosecution, and that in such a case estoppel might be inappropriate."  *Id.* at 289-90.

The *McCutchen* court held that *Haupt*'s reasoning was equally applicable under California law. It noted that in California a finding of probable cause to hold a defendant over for trial is a final judgment on the merits because the accused can immediately appeal the determination by filing a motion to set aside the results of the preliminary hearing, and can seek review of the trial court's ruling on the motion to set aside by filing a petition for a writ of prohibition.  *McCutchen*, 73 Cal.App.4th at 1146. The court also held that "a ruling on sufficiency of the evidence at a preliminary hearing would, in most cases, meet the identity of the issues requirement.  The quantum of evidence required to support a warrantless arrest is the same as the quantum of evidence required to hold the defendant to stand trial." *Id.*  Thus, the *McCutchen* court held that "absent a showing that evidence not available to the arresting officer was presented at the preliminary hearing, a finding of sufficiency of the evidence to require the

1   defendant to stand trial is a finding of probable cause to arrest the defendant." *Id.  See also McIntosh*

2   *v. Prestwich*, 277 Fed.Appx. 683, 683 (9th Cir. May 5, 2008) (Unpub. Disp.) (applying *McCutchen* in

3   reviewing a determination that a finding in state criminal proceedings that probable cause existed to hold

4   defendant over for trial estopped a subsequent § 1983 suit alleging no probable cause to arrest, as the

5   "state court had before it the same evidence that defendants relied upon to support the [arrest] warrant").

6          It also held that a preliminary hearing gives the accused "ample opportunity to litigate the issue

7   of probable cause to arrest." *McCutchen*, 73 Cal.App.4th at 1147.  As respects an accused's motivation

8   to litigate probable cause, the *McCutchen* court held that "unless the plaintiff in a civil suit can

9   demonstrate that the issue of probable cause was not litigated at the preliminary hearing for tactical

10  reasons, we will presume that the plaintiff had a full and fair opportunity to litigate the issue of probable

11  cause to arrest." *Id.*

12         The *McCutchen* court identified three situations in which a preliminary hearing will not

13  collaterally estop a plaintiff from pursuing a later civil claim based on the same issue:

14         (1) "where there were facts presented to the judicial officer presiding over the

15         preliminary hearing which were additional to (or different from) those available to the

16         officers at the time they made an arrest; or (2) where tactical considerations prevented

17         a litigant/prior criminal defendant from vigorously pursuing the issue of probable cause

18         during the prior criminal prosecution/preliminary hearing" . . . ; [or] (3) "[w]hen the

19         officer misrepresents the nature of the evidence supporting probable cause and that issue

20         is not raised at the preliminary hearing." *Moreno v. Baca*, No. CV 00-7149 ABC (CWX),

21         2002 WL 338366 at *6 (Feb. 25, 2002) (citing *McCutchen*, 73 Cal.App.4th at 1147).  *See*

22         *also Meza v. City of Los Angeles*, No. CV 08-02237DDP(JTLX), 2009 WL 1476985, at

23         *3 (C.D. Cal. May 26, 2009) ("[A] preliminary hearing on probable cause also does not

24         bar later litigation where 'additional evidence of a defendant's guilt' is presented at the

25         hearing that was not present when the original arrest was made," quoting *Haupt*, 17 F.3d

26         at 289).

27         Galvan argues that the first exception applies here.  Specifically, he argues that while Terrazas

28  testified at the preliminary hearing about the "Peruvian hat" in his attempt to support probable cause for

16

Galvan's arrest, this was not information that the defendants possessed when they arrested Plaintiff - the hat was only discovered in Galvan's residence *after* Galvan had been arrested.[62]  Further, although both Carpenter and Loving testified at the preliminary hearing, defendants had not yet interviewed Carpenter at the time of Galvan's arrest.[63]

Defendants argue that because Loving's statement was alone sufficient to establish probable cause, and because Loving testified at the preliminary hearing, the outcome of the hearing would have been the same even if additional material had not been presented at the hearing.  Setting aside the fact that defendants' argument requires the court to resolve the very issue that defendants claim is estopped - whether Loving's testimony is sufficient to support probable cause – defendants' argument misstates the law.

"[T]he [*McCutchen*] test is not dependent on whether the court *relied* on new evidence, but merely whether there is 'a showing that evidence not available to the arresting officer was *presented* at the preliminary hearing.'"  *Meza*, 2009 WL 1476985, at *4 (quoting *McCutchen*, 73 Cal.App.4th at 1146) (emphasis added).  "A magistrate judge's finding of probable cause based on the testimony of two witnesses . . . obviously does not resolve whether the officers had probable cause to arrest if only one witness was available and known to them at the time of arrest."  *Wige v. City of Los Angeles*, 713 F.3d 1183, 1186 (9th Cir. 2013).  Thus, the court need not consider the hypothetical outcome of a preliminary hearing where only Loving's testimony was presented.  The evidence presented at the hearing exceeded the evidence available to the defendants at the time the arrest was made.  The criminal preliminary hearing therefore does not estop Galvan from asserting lack of probable cause in the present case.[64]

/ / /

/ / /

---

[62]SUF, ¶ 75; SGI, ¶ 75.

[63]SUF, ¶¶ 54, 83; SGI, ¶¶ 54, 83.

[64]Because the court deems that collateral estoppel does not apply, it need not address Galvan's alternate argument that defendants may have waived collateral estoppel as an affirmative defense by failing to specifically plead it, nor his alternate argument that collateral estoppel should not apply because evidence presented at the preliminary hearing was allegedly fabricated.

1
              **3.**      **Whether Plaintiff Has Raised a Dispute of Fact Regarding Whether**

2
                        **Defendants Had Probable Cause to Arrest**

3
      Galvan claims that defendants did not have probable cause at the time of his arrest.  Defendants

4
concede that they relied primarily on the recorded statement and identification made by Loving on

5
February 28, 2011.  Galvan argues that Loving's testimony alone was not sufficient to establish probable

6
cause, given the circumstances undermining the reliability of Loving's testimony and given all of the

7
contrary evidence defendants had discovered prior to the arrest.

8
      "An informant's description of illegal activity is sufficient to establish probable cause if the

9
totality of the circumstances indicate that the tip is reliable." *U.S. v. Elliott*, 893 F.2d 220, 223 (9th Cir.

10
1990) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).  The court should consider the informant's

11
veracity, reliability, and basis of knowledge, as well as the extent to which an informant's statements

12
are independently corroborated. *United States v. Sharpe*, 307 F. App'x 46, 47 (9th Cir. 2009). *See also*

13
*United States v. Lucas*, 990 F.2d 1263 (9th Cir. 1993)("In considering the 'totality of the circumstances,'

14
the court should consider the informant's history of reliability or basis of knowledge.  A tip has greater

15
weight where there is a detailed description of the alleged wrongdoing.  In addition, corroboration of

16
the details of an informant's tip by independent police work help support a finding of probable cause,"

17
citing *Illinois*, 462 U.S. at 233-34, 241; *United States v. Ayers*, 924 F.2d 1468, 1478 (9th Cir.1991);

18
*Elliott*, 893 F.2d at 223; *Harper*, 928 F.2d at 896))

19
      Defendants contend that Loving's statement was sufficient probable cause to arrest.  Galvan

20
argues that the Loving identification was not sufficient to establish probable cause because the veracity

21
and reliability of Loving's statement was severely undercut by the fact that the police had harassed him

22
for weeks in an attempt to elicit such a statement.  In particular, Carpenter and Loving were homeless,

23
and living together in a makeshift tent in the alleyway behind Galvan's house.  Defendants harassed

24
these two already-vulnerable individuals, tearing the top off their tent, pushing them up against the

25
fence, threatening them with arrest, and hauling them into the police station.  Galvan argues that under

26
these circumstances defendants should have known that Loving would tell defendants what they wanted

27
to hear - regardless of its veracity - in order to put a stop to the harassment.

28
/ / /

On the other hand, defendants argue that Loving's identification was credible for a number of reasons. First, they argue that Loving's identification was credible because he was familiar with Galvan, having lived in the alley adjacent to Galvan's residence for some time.[65] However, a reasonable jury could also find these facts to support the alternate theory that defendants pressured Loving into giving them any name, and Loving just chose someone he knew who lived nearby in order to put a stop to the harassment.

Second, defendants argue that they corroborated Loving's statement by locating and reviewing the December 20, 2010 report, which indicated that Galvan had been shot in the foot at the same intersection where Galvan later allegedly shot Gutierrez. This corroborated Loving's statement that Galvan shot Gutierrez in retaliation.[66] However, as discussed above, defendants have not presented any evidence establishing whether they viewed the report before or after arresting Galvan.

Third, defendants argue that Loving's testimony was corroborated by portions of Jurado's eyewitness interview. Specifically, Galvan's physical appearance and age at the time of his arrest were similar and consistent with Jurado's description. However, as discussed above, other portions of the Jurado interview contradict Loving's statement: for example, Jurado's statement that the shooter ran from the scene, despite the fact that Galvan was injured at the time the shooting took place.

Fourth, defendants argue that a cap found in plaintiff's house matched a Peruvian style cap that Jurado had stated was worn by the suspect the defendants believed shot and killed Gutierrez.[67] However, defendants did not discover a Peruvian cap at Galvan's residence until after they arrested Plaintiff.[68] The cap therefore cannot form a basis for probable cause to arrest. *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1995)("Facts learned or evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made," citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963))).

---

[65]SUF, ¶ 60; Terrazas Decl., ¶ 34; Nunn Decl., ¶ 15.

[66]SUF, ¶¶ 64-65.

[67]SUF, ¶¶ 31, 32, 56, 75.

[68]SGI, ¶¶ 75, 263.

Finally, defendants argue that they did not know Galvan prior to his arrest.  Thus, they would have had no reason to pressure Loving to give testimony falsely accusing Galvan.[69]  Galvan correctly asserts that this argument is irrelevant.  Defendants did not need to have specifically coerced Loving into falsely accusing *Galvan* to lack probable cause.  It is sufficient that the totality of the circumstances should have indicated that Loving's testimony was unreliable.  *See Elliott*, 893 F.2d at 223.

Galvan further argues that it was not reasonable for defendants rely on Loving's statement because it contradicted the information the officers had to date - including testimony from an actual eyewitness.  Galvan contends that it was unreasonable for defendants to completely disregard this information in favor of the unverified and unsubstantiated statement from a non-eyewitness, whose testimony was the result of several weeks of police harassment and threats.

First, while Loving told defendants that the motive behind the shooting was revenge for Galvan's foot injury,[70] prior evidence pointed to the theory that the shooting occurred because Gutierrez was crossing out a rival gang's graffiti.  Defendants knew that there was a rivalry between the HOB gang and the 41st Street gang, and that the location of the murder was a dividing line between the two territories.[71]  During the investigation, defendants interviewed gang members who told them that, on the night of the shooting, Gutierrez went to the northwest corner of Main and 43rd to erase 41st Street graffiti.  As he was about to tag out the graffiti, he spotted two rival 41st Street members by an apartment across the street and opened fire on them; one of the 41st Street members fired back.[72]  Defendants indicated that

/ / /

/ / /

---

[69]SUF, ¶ 53; SGI, ¶ 53.

[70]SUF, ¶¶ 167-68; SGI, ¶¶ 167-68.

[71]SUF, ¶ 19; SGI, ¶ 19.

[72]See Plaintiff's Exh. 17 (Cifuentes Interview Transcript), Docket No. 54-4 (Dec. 7, 2015); Plaintiff's Exh. 18 (Flores Interview Transcript), Docket No. 54-6 (Dec. 7, 2015) at 4("there was some writing that was across the street.  It was 41st Street writing . . .").  Defendants object to these exhibits as hearsay.  However, the exhibits are not used to prove the truth of the matter asserted, but are rather offered to demonstrate what information the defendants had heard at that point in the investigation.  Defendants' objections are denied.

1  they believed this theory months later in an affidavit supporting their request to transfer Carpenter and

2  Loving.[73]

3        Even more troublingly, Loving's identification of Galvan, who had an injured foot, conflicted

4  with Jurado's eyewitness testimony that the shooter ran away from the scene of the crime.  At the time

5  of the shooting Galvan could barely walk without assistance and crutches.[74]

6        Taking Galvan's version of the disputed facts as true - that defendants continued to pursue and

7  arrest Galvan based on testimony that had been coerced from a vulnerable, unrealiable witness, despite

8  of additional evidence that rendered that witness's testimony unlikely if not impossible - a reasonable

9  jury could conclude that defendants did not have probable cause to arrest Galvan, in violation of

10  Galvan's clearly established right to be free from arrest without probable cause.  *Kennedy v. Los Angeles*

11  *Police Dep't,* 887 F.2d 920, 924 (9th Cir. 1989) ("It is clearly established, of course, that an arrest

12  without probable cause violates the Constitution").  Defendants' motion for summary judgment is denied

13  with regard to Galvan's unlawful arrest claim.

14       **D.**     **Whether Defendants are Entitled to Summary Judgment on Plaintiff's Malicious**

15             **Prosecution Claim**

16        In deciding malicious prosecution cases, the Ninth Circuit has "long recognized that '[f]iling a

17  criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is

18  presumed that the prosecutor filing the complaint exercised independent judgment in determining that

19  probable cause for an accused's arrest exists at that time.'"  *Newman v. Cnty. of Orange*, 457 F.3d 991,

20  993 (9th Cir. 2006) (quoting *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981) (*Smiddy I*) (alterations

21  original)).  Thus, "where police officers do not act maliciously or with reckless disregard for the rights

22

23       [73]SGI, ¶ 259; Plaintiff's Exh. 11 (Witness Relocation and Assistance Program Application),

24  Docket No. 53-11 (Dec. 7, 2015). Defendant objects to Exhibit 11 as confidential pursuant to Cal. Penal
   Code § 14029. However, the code section defendants cite merely states that information relating to

25  witnesses involved in the witness protection program is not subject to disclosure under the California
   Public Records Act.  Moreover, the exhibit has been filed under seal and has not been publicly

26  disclosed.  Defendant's objection is overruled.

27       [74]SGI, ¶¶ 253, 258, 264.  As discussed *infra*, a material dispute of fact exists as to whether Jurado

28  later called to change his testimony regarding the shooter running with a limp.

1   of an arrested person, they are not liable for damages suffered by the arrested person after a district

2   attorney files charges unless the presumption of independent judgment by the district attorney is

3   rebutted." *Smiddy I*, 665 F.2d at 267.  "The plaintiff bears the burden of producing evidence to rebut

4   such presumption." *Newman*, 457 F.3d at 993.

5          In *Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986) (*Smiddy II*), the Ninth Circuit found

6   that the presumption of prosecutorial independence is not overcome where the plaintiff has adduced no

7   evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that

8   the officers knowingly withheld relevant information with the intent to harm [him], or that the officers

9   knowingly supplied false information."  Subsequent Ninth Circuit cases have further explained the type

10  of evidence that will suffice to overcome the presumption.  For example, in *Borunda v. Richmond*, 885

11  F.2d 1384 (9th Cir. 1988), the Ninth Circuit found that the plaintiff had rebutted the presumption of

12  independent judgment where the defendant officers "procured the filing of the criminal complaint by

13  making misrepresentations to the prosecuting attorney."  *Id.* at 1390.  *See also Blankenhorn v. City of*

14  *Orange*, 485 F.3d 463, 483-84 (9th Cir.2007) (finding summary judgment improper where evidence

15  demonstrated that prosecutor had not viewed a key videotape prior to filing charges and other evidence

16  demonstrated that the officers' reports were false and misleading); *Newman v. County of Orange*, 457

17  F.3d 991, 995 (9th Cir. 2006)("Because Sloman had no evidence of material omissions, or inconsistent

18  police or eyewitness accounts, he could not demonstrate a genuine issue of material fact as to whether

19  the prosecutor exercised independent judgment.  Summary judgment for the defendant officers was

20  therefore appropriate," citing *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994)); *Barlow v.*

21  *Ground*, 943 F.2d 1132, 1136-37 (9th Cir. 1991) (civil rights plaintiff overcame the *Smiddy* presumption

22  the prosecutor relied solely on the arresting officers' reports, which omitted critical information, an

23  independent witness corroborated at least part of plaintiff's version of events, and the officers' accounts

24  varied).

25         Galvan attempts to overcome the presumption of prosecutorial independence by alleging that

26  a number of pieces of evidence presented to the District Attorney's office were fabricated.  Galvan first

27  argues that defendants falsified a phone call from Jurado, which allegedly reframed Jurado's eyewitness

28  testimony to accommodate the fact that Galvan had been injured on the day of the murder.  Galvan

argues that when he was arrested on March 1, 2011, it was apparent to defendants that he was incapable of putting weight on his injured foot.  To justify arresting a man who could not stand on his foot, let alone "run," Terrazas fabricated an entry in the Murder Book Chronology, stating that on February 14, 2014, Jurado had called him to tell him he had forgotten to mention that the suspect he had seen running had actually run with a "noticeable limp" and that "it appeared the suspect had possibly been shot in the leg during the altercation."[75]

As discussed above, a question of fact remains as to whether such a phone call took place. Defendants' exhibits 12 and 13 indicate that Terrazas called Jurado twice on February 13th, and that Jurado returned his call twice. This conversation occurred before the entry in the chronological record dated February 14, 2011, making it possible that Terrazas' previous testimony stating that the conversation took place on February 14, 2011 was a minor mistake as to the details of when the call took place, but not as to its contents.  However, the phone record also reveals that each phone call was very short: two of the phone calls were only one minute long, one was two minutes long, and the other was five minutes long. Further, based on the phone record, Terrazas called Jurado first: a fact that is potentially inconsistent with Terrazas' testimony that Jurado contacted him to provide additional information.

While it is possible that Jurado could have provided the additional information during that time, a reasonable jury could find otherwise: that the February 13th phone record documents a short game of "phone tag," which did not culminate the conversation recorded in the February 14th Murder Book Chronology.  Plaintiff has therefore raised a material dispute of fact as to whether Jurado's additional testimony was fabricated.

Galvan next argues that he has overcome the presumption of prosecutorial independence because defendants provided the prosecutor with the recorded statements of Loving and Carpenter, which plaintiff contends were taken under improperly coercive conditions.  While the factual circumstances under which Loving and Carpenter's statements were taken may have had some impact on their veracity, it is not reasonable to conclude that these factual circumstances interfered with prosecutorial

---

[75]SIG, ¶ 253; Plaintiff's Exh. 10 (Chronological Record), Docket No. 53-1 (Dec. 7, 2015) at 2.

independence. Loving and Carpenter testified as to the conditions that prompted them to give their statements at the preliminary hearing.[76]  Nonetheless, the district attorney continued to prosecute. Additionally, although plaintiff contends that defendants concealed the fact that they had obtained $10,000 to provide Loving and Carpenter food, housing, and incidentals in connection with their relocation, plaintiff's own exhibit demonstrates that the request for such funding was made through the district attorney's office.[77]  Thus, plaintiff has not offered any evidence that the defendants withheld their treatment of Loving or Carpenter from the prosecutor or otherwise put undue pressure on the district attorney's office to compel them to prosecute.

Finally, plaintiff argues that defendants offered Cifuentes's falsified Witness Statement to the prosecution.  As discussed above, Galvan has raised a dispute of fact as to whether defendants fabricated the portion of the report that references "Insane," and states that the shooter had been shot in the foot.

Despite the fact that Galvan has raised disputes of fact with regard to the alleged fabrication of the Jurado follow-up phone call report and Cifuentes witness report, these disputes are ultimately immaterial to plaintiff's malicious prosecution claim, because there is no evidence suggesting that the district attorney relied on these reports when deciding to bring and continue to pursue charges against Galvan.  It is entirely unclear from the summary judgment record what evidence the district attorney relied upon in seeking to prosecute Galvan, and hence the court cannot decide that the district attorney relied exclusively, or even in substantial part, on the Jurado follow-up phone call or the Cifuentes transcript. *Compare with Sloman*, 21 F.3d at 1474 ("The prosecutors who filed the case against Sloman, Jay Orr and David Doyle, both submitted affidavits stating that they had exercised independent judgment in filing the case.  They admitted, however, that they based their judgment exclusively on the police reports submitted by Officers Hale and Sliester"); *Borunda*, 885 F.2d at 1390 ("The criminal prosecutor had no information available to him other than that contained in the police report submitted by appellants"); *Child v. City of Portland*, 547 F.Supp.2d 1161, 1167 (D. Or. 2008) ("First, the

---

[76]SUF, ¶¶ 126-28, 132, 183-86; SGI, ¶¶ 126-28, 132, 183-86.

[77]Plaintiff's Exhibit 15 (Witness Relocation Assistance Program Witness Advisement Form), Docket No. 53-6 (Dec. 7, 2015).

1   presumption of prosecutorial independence is subject to rebuttal in this case because the district attorney

2   made the charging decision based solely on the evidence in the police reports"); *Pankey v. City of*

3   *Concord*, No. CV-06-03737 JCS, 2007 WL 2253401, *20 (N.D. Cal. Aug. 2, 2007) ("Accordingly, the

4   Ninth Circuit reversed the District Court's grant of summary judgment on a malicious prosecution claim

5   where the Plaintiff alleged that the police had included false information in their police reports upon

6   which the district attorney had relied").  For that reason, the court cannot conclude that the District

7   Attorney's decision to prosecute was "based almost entirely on the police investigation [and reporting]

8   [that reasonably could be] adjudged to be deficient by the jury."  *Harper v. City of Los Angeles*, 533

9   F.3d 1010, 1027 (9th Cir. 2008).  Thus, although there is a triable issue as to whether defendants

10  provided false information to the District Attorney because there is no evidence that the District

11  Attorney relied on the Jurado or Cifuentes reports in electing to prosecute, summary judgment on this

12  claim in defendants' favor is warranted.[78]

13        **E.    Whether Defendants are Entitled to Summary Judgment on Plaintiff's Fabrication**

14              **of Evidence Claim**

15        Galvan additionally argues that defendants violated his 14th Amendment right to due process

16  by fabricating material evidence.  Allegations that material evidence was fabricated or falsified will

17  support a § 1983 claim for deprivation of liberty without due process of law if the evidence was used

18  at trial or in filing charges.  *See, e.g., Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("We

19  are persuaded that there is a clearly established constitutional due process right not to be subjected to

20  criminal charges on the basis of false evidence that was deliberately fabricated by the government");

21  *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) ("Under law that was clearly established

22  in 1994, Wince would have violated Stemler's right to due process if he knowingly fabricated evidence

23

24        [78]At the hearing, Galvan's counsel discussed additional pieces of evidence and testimony that

25  they contend were fabricated and presented to the district attorney.  However, even if this evidence or
    testimony was fabricated, Galvan has not introduced any evidence that the district attorney relied on the

26  falsified evidence.  In fact, as the parties noted at the hearing, the district attorney's office has lost
    Galvan's criminal file, meaning that evidence indicating what the district attorney relied on in deciding

27  to prosecute Galvan may no longer exist.  Thus, notwithstanding counsels' additional arguments at the

28  hearing, Galvan's malicious prosecution claim must fail for the reasons stated above.

1  against her, and if there is a reasonable likelihood that the false evidence could have affected the
2  judgment of the jury").

3      "To support a *Devereaux* deliberate-fabrication-of-evidence claim, a plaintiff: must, at a
4  minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants
5  continued their investigation of [plaintiff] despite the fact that they knew or should have known that he
6  was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that
7  they knew or should have known that those techniques would yield false information." *Hall v. City of*
8  *Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012).

9      As discussed above, plaintiff has raised a dispute of fact as to whether the Jurado phone call
10  report and Cifuentes witness statement were fabricated.  If the finder of fact determines that the reports
11  were, in fact, fabricated, it would also be reasonable to infer that Terrazas knew that he was recording
12  false information and that the false information could have affected the judgment of the jury.  Such
13  blatant fabrication would be in violation of clearly established law, precluding the application of
14  qualified immunity. Thus, plaintiff's fabrication of evidence claim survives summary judgment to the
15  extent that it is based on the Jurado phone call report and the Cifuentes witness statement.

16      Galvan additionally argues that defendants' treatment of Loving and Carpenter supports a
17  fabrication of evidence claim under the second *Devereaux* prong.  Specifically, he argues that
18  defendants' investigative techniques -- repeatedly harassing two, drug-addicted homeless adults until
19  they volunteered a statement that inculpated Galvan -- were so coercive that defendants should have
20  known they would yield false information.[79]  However, "[s]uggestive interview tactics alone do not
21  amount to a constitutional violation." *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003).  Resolving
22  all disputes of fact in favor of the nonmoving party, the court concludes that although the defendants
23  did use intimidation tactics in order to convince Loving and Carpenter to give statements, their actions
24  do not rise to the high level of coercion required to establish a fabrication of evidence claim under prong
25  two of *Devereaux. Compare Gausvik*, 345 F.3d at 817 (officer's continued questioning of alleged sexual
26  abuse victims after victims initially denied abuse and telling alleged victim she could not leave until she

27
28      [79]SGI, ¶¶ 72, 83, 126, 128-29, 132, 134-36, 138-39, 184-86, 220, 261.

1    admitted abuse not so coercive and abusive that officer knew or should have known that he would
2    receive false information).  There is no evidence to show that the officers coerced Loving and Carpenter
3    into testifying against any suspect in particular, or that they should have known that Loving and
4    Carpenter's testimony would necessarily be false.

5        Further, even if defendants' actions did arguably approach the extremely violative tactics
6    prohibited by the second prong of *Devereaux*, such law was not clearly established at the time
7    defendants took the statements of Loving and Carpenter; defendants would therefore be protected by
8    qualified immunity.  Summary judgment is therefore granted in favor of the defendants to the extent that
9    plaintiff's fabrication of evidence claim is based on the techniques used in extracting statements from
10   Loving and Carpenter.[80]

11       **F.     Whether Defendants are Entitled to Summary Judgment on Plaintiff's *Brady* Claim**

12       Galvan additionally alleges that the defendants failed to disclose several pieces of evidence, in
13   violation of *Brady v. Maryland*.  The government has a constitutional duty to disclose, upon request, all
14   evidence favorable to a defendant that is material either to guilt or to punishment.  *Brady v. Maryland*,
15   373 U.S. 83, 87 (1963)("We now hold that the suppression by the prosecution of evidence favorable to
16   an accused upon request violates due process where the evidence is material either to guilt or to
17   punishment"); *id*. ("suppression by the prosecution of evidence favorable to an accused upon request
18   violates due process where the evidence is material either to guilt or to punishment, irrespective of the
19   good faith or bad faith of the prosecution").  Evidence is "material" for *Brady* purposes when there is
20   a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have
21   been different.  *Cone v. Bell*, 556 U.S. 449, 469-470 (2009).  For a *Brady* claim to succeed, "[1] [t]he
22   evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

23

24       [80]Defendants argue that to the extent that plaintiff's fabrication of evidence claim is based on
25   Terrazas's trial testimony, witness immunity applies.  (See Motion at 11.)  Plaintiff does not address this
     argument in his opposition, nor is Terrazas's trial testimony listed as a part of the fabrication of evidence
26   claim in the complaint.  The court therefore interprets plaintiff's fabrication of evidence claim to be
     limited to the bases discussed in the opposition: the two allegedly fabricated reports, and the methods
27   used to obtain statements from Loving and Carpenter. As such, the court need not address defendants'
28   witness immunity argument.

impeaching; [2] that evidence must have been suppressed by the State . . . ; and [3] prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)) (internal quotation marks omitted).

As a threshold matter, defendants argue that Galvan cannot demonstrate prejudice because he was acquitted on all counts; thus, any exculpatory evidence would not have changed the outcome of the proceedings. The issue of whether an individual who was acquitted at trial may pursue a Section 1983 claim under *Brady* was first addressed by the Ninth Circuit in *Smith v. Almada*, 623 F.3d 1078 (9th Cir.2010), withdrawn and superseded by 640 F.3d 931 (9th Cir.2011). In the superseding opinion, the *Almada* court declined to reach a decision on the issue. 640 F.3d at 940-41. Nonetheless, each of the judges provided their view. Judge Gwin determined that a criminal defendant who is ultimately acquitted should not be able to pursue a *Brady* claim, explaining that "allowing *Brady*-based § 1983 claims without a conviction is not compelled by our circuit's case law, conflicts with other circuits' case law and the central purpose of Brady, would render Brady' s materiality standard significantly less workable, and lacks a limiting principle." *Id.* at 941-45. Judge Gould indicated that he personally agreed with Judge Gwin, but would not rule on the issue because it was not necessary for the purposes of that decision. *Id.* at 940-41. Judge disagreed with Judge Gwin's position that a conviction should be a prerequisite to a Brady claim under Section 1983. *Id.* at 945-48.

In a subsequent unpublished decision, *Puccetti v. Spencer*, 476 Fed.Appx. 658, 2011 WL 6292200, *1 (9th Cir. Dec. 16, 2011), the Ninth Circuit adopted the position of Judge Gwin, finding that where a plaintiff's criminal charges were dismissed, the plaintiff could not show that any suppressed evidence could have produced a different result at trial. The court noted that "[o]ur sister circuits have adopted identical reasoning in denying *Brady* claims when the plaintiff was never convicted." *Id.* (citing *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir.1999); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir.1998); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir.1988)).[81] *See also Dinius v.*

---

[81]Despite this unpublished opinion, the Ninth Circuit still deems the question posed in *Smith v. Alamada* to be an open question. *Forest v. City of Ft. Bragg*, 520 F. App'x 616, 617 (9th Cir. 2013)("We decline to reach the question left open in *Smith v. Almada*, 640 F.3d 931, 941 (9th Cir.2011) (Gwin, J., concurring), asking whether *Brady* claims can be brought by a defendant who was not convicted").

1  *Perdock*, No. C 10-3498 MEJ, 2012 WL 1925666, at *5-6 (N.D. Cal. May 24, 2012) (dismissing with

2  prejudice plaintiff's Section 1983 claim under *Brady* because he had been acquitted in the underlying

3  criminal matter); *cf. Ramirez v. Cty. of Los Angeles*, 397 F. Supp. 2d 1208, 1227 (C.D. Cal. 2005)("The

4  problem with Plaintiff's independent *Brady* claim is that he actually received all of the evidence before

5  trial, was found not guilty of the crime and was ultimately adjudged factually innocent. Therefore, he

6  cannot show that he would have obtained a better result at trial had the information been disclosed

7  sooner").

8      In the absence of contrary authority, the court follows the reasoning of Judge Gwin, the *Puccetti*

9  court, and the other circuits to have ruled on the question.  Galvan's *Brady* claim must be dismissed as

10  a matter of law because Galvan was acquitted and cannot prove that further exculpatory evidence, such

11  as that which was allegedly concealed, would have changed the outcome of his case.  The court grants

12  summary judgment on plaintiff's *Brady* claim in favor of defendants.

13      **G.      Whether Nunn is Entitled to Summary Judgment on Plaintiff's Failure to Intervene**

14      **Claim**

15      Galvan asserts a failure to intervene claim against Nunn only, arguing that Nunn investigated

16  the murder alongside Terrazas, and was present during the witness interviews of Loving, Carpenter, and

17  Jurado.  He argues that Nunn had the opportunity to prohibit Terrazas from fabricating evidence that

18  falsely implicated Plainitff, including the alleged fabrication of the Jurado phone call and Cifuentes

19  interview reports.  In sum, Galvan appears to have included the claim to cover any instances when

20  Terazzas was the active participant and Nunn was only an observer.

21      "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional

22  rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1446-47 n. 25 (9th Cir. 1994),

23  rev'd on other grounds, 518 U.S. 81 (1996).  "An officer who fails to intercede is liable for the

24  preventable harm caused by the actions of the other officers where that officer observes or has reason

25  to know . . . that a citizen has been unjustifiably arrested." *Anderson v. Branen*, 17 F.3d 552, 557 (2d

26  Cir. 1994) (citations omitted).  "[T]he constitutional right violated by the passive defendant is

27  analytically the same as the right violated by the person who strikes the blows.  Thus an officer who

28  failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be

1  free form unreasonable force in the course of an arrest would, like his colleagues, be responsible for

2  subjecting the victim to a deprivation of his Fourth Amendment rights." *United States v. Koon*, 34 F.3d

3  1416, 1447 n.25 (9th Cir. 1994), vacated in part on other grounds by *Koon v. United States*, 518 U.S.

4  81 (1996).

5  Officers can be held liable for failing to intercede only if they had an opportunity to intercede,

6  however.  *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000).  In order to succeed on a

7  failure to intervene claim, therefore, Galvan must prove: (1) Galvan's constitutional right to be free from

8  an unreasonable seizure was violated; (2) Nunn was present when Galvan suffered this constitutional

9  deprivation; (3) Nunn had a realistic opportunity to intervene and prevent Galvan from suffering a

10  deprivation of his constitutional rights; and (4) Nunn's failure to intervene was a substantial factor in

11  causing harm to Galvan.  *See Koon*, 34 F.3d at 1446 n.25.

12  As discussed above, the only theories of individual Section 1983 liability that survive the present

13  motion for summary judgment are the unlawful arrest and fabrication of evidence claims.  The record

14  does not contain any evidence that Nunn knew about the fabrication of the phone call with Jurado or of

15  Terrazas's allegedly false recordation of the contents of that call.  The record does not therefore support

16  Nunn's liability based on a failure to intervene theory, to the extent that it is based on the Jurado phone

17  call.

18  There is a dispute of fact as to whether Nunn was present at the Cifuentes interview.  Nunn states

19  in his declaration that he did not interview Cifuentes;[82] the Cifuentes interview report states otherwise.[83]

20  Regardless, it is undisputed that the Cifuentes interview was conducted in Spanish,[84] and that Nunn does

21  not speak Spanish.[85]  Thus, the only way that Nunn would have been able to intervene is if the contents

22  of the interview were translated for him prior to the filing of the allegedly falsified report.  Galvan has

23  provided no such evidence.  In fact, the translated interview transcript submitted in connection with the

---

[82]Nunn Decl., ¶ 8.

[83]Plaintiff's Exhibit 25 (Cifuentes Statement Form), Docket No. 53-11 (Dec. 7, 2015).

[84]Plaintiff's Exhibit 17 (Cifuentes Interview Transcript), Docket No. 53-4 (Dec. 7, 2015).

[85]Nunn Decl., ¶ 13.

present motion is dated June 15, 2011; while the allegedly false report is not dated, the interview itself took place on February 9, 2011.[86]  Thus, Galvan has not established that it was possible for him to intervene before Terrazas submitted the witness report.

However, Nunn was also involved generally in Galvan's arrest and therefore may potentially be held liable to the extent that Galvan was arrested without probable cause.  As discussed above, plaintiff has raised triable questions of fact with regard to this theory of liability.

Nunn argues that the evidence does not support a claim for failure to intervene with regard to the alleged arrest without probable cause because he states in his declaration that he believes Galvan shot and killed Gutierrez.[87]  Nunn argues that because he subjectively believed the arrest was lawful, he did not have a realistic opportunity to intervene in any allegedly unlawful arrest.

"Summary judgment, however, is unwarranted if based simply on Defendants' declarations as to their own state of mind."  *Kodimer ex rel. Lyn Ramskill v. Cty. of San Diego*, No. 07-CV-2221-BEN, 2010 WL 2635548, at *3 (S.D. Cal. June 30, 2010)(citing *Conn*, 591 F.3d at 1097).  "Proof of 'subjective awareness' is not limited to the purported recollections of the individuals involved." *Conn*, 591 F.3d at 1097.  As discussed above, Galvan has raised an issue of fact as to whether there was sufficient probable cause for arrest - that is, whether the officers had sufficient information to allow a reasonable officer to deduce that he had committed murder.  Even if Nunn was an observer, rather than an active participant, in Galvan's arrest, a reasonable juror could conclude that if Terrazas did not have enough information to reasonably believe Galvan had committed a crime, Nunn did not have enough information either and should have stopped the arrest or prosecution from taking place.  Nunn's own conclusory assertion as to his own state of mind is not sufficient to defeat this factual dispute.

In sum, Nunn's motion for summary judgment with regard to the unlawful arrest claim is denied. The court grants summary judgment in favor of Nunn with regard to the alleged falsification of the Jurado phone call and Cifuentes interview reports.

/ / /

---

[86]Plaintiff's Exhibit 25 (Cifuentes Statement Form).

[87]See Nunn Decl., ¶ 6.

K.      **Whether the City of Los Angeles is Entitled to Summary Judgment on Plaintiff's** *Monell* **Claim**

Finally, Galvan brings a *Monell* claim against the City of Los Angeles, claiming that his alleged false arrest and malicious prosecution were caused by the City's unconstitutional policies, practices or customs.

A municipal defendant cannot be held liable for a Section 1983 violation caused by an individual employee's actions on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*"). Rather, under *Monell*, municipal liability must be based on enforcement of a municipal policy or custom that causes a plaintiff to be deprived of a constitutional right, not merely on the municipality's employment of a constitutional tortfeasor. *Monell*, 436 U.S. at 691.

Generally, a plaintiff can demonstrate municipal liability for a constitutional violation in one of three ways. First, he can show that a person or entity with final decision- or policy-making authority within the municipality expressly adopted or executed an unconstitutional policy or gave an unconstitutional order. *See id.* at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question"). Second, a plaintiff can prove that his injury was the result of a municipal custom, *i.e.*, a practice "so permanent and settled" as to constitute a "custom or usage" of the municipal defendant. *See Monell*, 436 U.S. at 691; *see also Pembaur*, 475 U.S. at 481-82 n.10. Finally, a local governmental body may be liable if its failure to train employees has caused a constitutional violation and the failure to train amounts to deliberate indifference to the rights of individuals with whom those employees come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

Further, municipal defendants cannot be held liable when no constitutional violation has occurred. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994). Thus, "[t]o prevail on a § 1983 claim against a local government under Monell, a plaintiff must satisfy a three-part test: (1) an official violated

the plaintiff's constitutional rights; (2) the violation is a part of [a] policy or custom and may not be an isolated incident; and (3) there is a nexus between the specific policy or custom to the plaintiff's injury." *Harper v. City of San Jose*, No. CV 09-05758 JW, 2011 WL 7109218, *3 (N.D. Cal. Mar. 7, 2011) (citing *Monell*, 436 U.S. at 690-92).

Galvan's *Monell* claim is based on the argument that the fact that defendants were not reprimanded for alleged unconstitutional activities on three occasions demonstrates a widespread practice or deliberate policy choice by a policy-making official.[88]   Galvan cites to three incidents: (1) a 2000 lawsuit, in which the Nunn and Terrazas were named as defendants; (2) a letter from the LA County Public Defender's office to the Los Angeles Police Department, reporting a separate instance of alleged misconduct by Terrazas; and (3) the fact that defendants have not been reprimanded for the alleged misconduct occurring in the present case.

Defendants argue that the fact that the 2000 lawsuit was initiated and settled does not demonstrate that defendants committed the acts of which they were accused in that case.  Thus, they argue, even if it were true that defendants were not reprimanded as a result of the lawsuit, this evidence does not establish or even tend to prove that previous constitutional violations had occurred.  Similarly, they argue that the letter from the LA County Public Defender's office in 2001 revealed that the officers did violate procedure by failing to disclose the search of the home of a criminal defendant, but that the remainder of the alleged misconduct did not occur.  The letter indicates that a penalty was assessed against the violating officers.  Finally, defendants argue that the misconduct alleged in the present case cannot support a claim for *Monell* liability because Galvan has not yet established that Nunn or Terrazas have participated in the alleged misconduct.

Although it is possible that none of these three incidents is sufficient to establish a municipal policy or custom in isolation, taken together the incidents potentially paint a different picture.  Upon viewing the evidence presented a jury could reasonably conclude that there had been a pattern of accusations regarding the misconduct of these particular defendants that the City failed to address.  The fact that the 2000 lawsuit was settled rather than dismissed, and the fact that the 2001 letter came from

---

[88]Opposition at 22-23.

1  the County Public Defender's office, both reasonably indicate that these complaints were at the very

2  least nonfrivolous and potentially warranting further municipal internal investigation.  Further, although

3  Galvan has not yet demonstrated defendants' guilt in this case, defendants' coercive interview

4  techniques were presented during the criminal trial, and many witnesses denied defendants' recorded

5  version of events, giving rise to an inference that evidence had been fabricated.  Thus, a reasonable jury

6  could conclude that the City should have engaged in some further investigation with regard to the

7  defendants' tactics in the underlying criminal case, even if Galvan had not filed the present civil action.

8       In sum, given the history of complaints against defendants and the City's apparent inaction in

9  response, the court finds that Galvan has raised at least a triable issue of fact with regard to whether the

10  city had a policy of implicitly approving of or at least failing to sufficiently train regarding constitutional

11  violations.  Defendants' motion for summary judgment is denied with regard to Galvan's *Monell* claim.

12                                    **III.  CONCLUSION**

13      For the reasons stated, the court grants defendants' motion for summary judgment with regard

14  to plaintiff's malicious prosecution claim.  The court also grants defendants' motion for summary

15  judgment with regard to plaintiff's fabrication of evidence claim to the extent that it is based on (1) the

16  techniques used in extracting statements from Loving and Carpenter and (2) Nunn's failure to intervene

17  in the alleged fabrication of the Jurado phone call and Cifuentes interview reports; the motion is denied

18  with regard to the other alleged fabrications against Nunn and Terrazas.  Summary judgment is also

19  denied with regard to plaintiff's unlawful arrest claims against Nunn and Terrazas, and his *Monell* claim

20  against the City.

21

22  DATED: March 1, 2015

23                                    CHRISTINA A. SNYDER
                                     UNITED STATES DISTRICT JUDGE

24

25

26

27

28